016-1636 LMK Technology versus BLD Services. Mr. Hardy, please proceed. May it please the court. The Patent and Trial Appeal Board urges legal determinations of obviousness based upon rationales that were not unique case I would submit. Why? Because all of the prior art is the inventor's own work. Larry Keist, a recognized innovation leader in the field, the prior references apply, tell, and are part of the invention story. They show the evolution of the technology. Mr. Keist testified as to the prior reference the board relied upon and that testimony was not challenged, no cross-examination, it stands unrebutted. And so what we have is a significant body of real-world evidence that is important to this appeal for a couple of reasons. First of all, much of it takes the form of what is fair to say are non-traditional forms of secondary considerations, objective evidence to show non-obviousness. What does that mean, non-traditional forms of secondary consideration evidence? Well, Your Honor, certainly Graham versus Deere has given us a list of various secondary considerations, not intended to be exclusive. In the KSR case, the Supreme Court told us it's a very expansive and flexible approach. We know from the Leo Pharma case, for example, lapse of time coupled with a non-recognition of the problem in the art. Those are what I would submit an example of a non-traditional form. Here we have, based on the record evidence, a industry standard based upon the Keist 118, which Mr. Keist deviated from. We also have the lapse of time, just as in Leo Pharma. Well, doesn't lapse of time require recognition of a problem that people are working to solve? Isn't that sort of, I mean, if lapse of time were enough, then would Graham versus John Deere have articulated long felt need and all these other things? I mean, they talk about time in Graham versus John Deere. So I'm just not sure the passage of time standing alone gets you anything at all. I agree, Your Honor. The passage of time alone does not get you there. And that's why this clarifies Leo Pharma to say that it's the lapse of time coupled with non-recognition of the problem in the art. What's the logic, just the simple, ordinary logic explaining why, I understand the logic, why lapse of time with recognition of the problem tends to suggest that people, ordinary skilled artisans, couldn't figure out how to solve it and, therefore, non-obviousness. What's the logic whereby lapse of time plus non-recognition of the problem tends to support a conclusion of non-obviousness in very common sense terms? I would submit, Judge Taranto, that the logic is that is, in oftentimes the cases, part of the invention can reside in recognizing what the problem is. And so when you couple those together, when you have this long period where people skilled in the art are not aware of, are not appreciating, have not recognized that problem, that is where the lapse of time analysis differs from the traditional long-felt need secondary edition that we have from Graham versus Deere. And that dovetails into this case where you have the inventor 13 years after the Keist 597 chemical grouting approach, and then four years after the Keist 118 water containment approach, then moves away from that industry standard. And the only record evidence... You've been going for several minutes and it just occurred to me that the clock had never started. So why don't we put the clock at 12 minutes? I think that should be about right. Did you raise a secondary considerations argument to the board? We framed it... And if so, where would that be in the record? If you look, Your Honor, it was raised... If you look at pages 23 to 31 of our reply brief, we spell out where it was raised to the board and from the get-go. Where in the joint appendix can I see that? I know the citations are provided there.  For example, we would submit the evolution of the technology and... Start with a page number. Yes. Appendix 143 to 144 explains how Mr. Keist's present inventions departed from his previous work. Appendix what? 143 to 144 and at 156. 143 to 144. Okay. 156 talks about how his inventions departed from his previous work. What document is this? 143, 144, 156. Oh, preliminary response by a patent owner. Yeah. So we're talking about the progression from the get-go there. As far as the actual patent owner's response, we stress that full appreciation for that... Again, a page number. I'm sorry. Appendix page 273 in the appendix, which refers to the patent owner's response. Is this under the heading technology background? Yes, it is. Is that the argument section or does your argument section begin at A297? Well, the argument section starts later. Also... I'm just trying to figure out to what extent did the board... Was the board on notice that it was obligated to evaluate and consider a secondary considerations argument in your briefing? Well, the consistent throughout, Your Honor, we argued as indicators for why the board's rationales were deficient were the real-world factors, like moving away from the industry standard, and the fact that this case is unique. It is the inventor's own work. That is in the actual argument section itself where we discuss the fact of if anyone... If this truly was an obvious variation of the Keist 118 to make this discrete hydrophilic band and move it to the junction, then Mr. Keist, more than anyone else, would have had the motivation, would have done that much earlier than he did. That's another consideration that bears upon that ultimate legal question of obviousness. If I turn to the rationales themselves, the board offered two rationales, both not supported by substantial evidence. Please remind me of something. Is there something either in the patent claims or in the board's construction of the patent claims that tells us what we're dealing with here is, to use your language, moving the bands to the elbow, or do the claims cover keeping the outside bands and adding one at the elbow? The claims are directed, Your Honor... Just to the elbow. ...to that pipe juncture, which you're referring to as the elbow, to provide a discrete hydrophilic band there, which happens to act as a multi-directional water stop. So the claims cover a situation where you're putting, as I think the expression was, a belt on top of the suspenders, which sometimes is a good idea. It's an open and it's a comprising claim. So the patent covers your second embodiment that's illustrated in Figure 6, which shows the gasket at the juncture, but then a second band further up the lateral pipeline, right? Because it is an open claim, Your Honor, yes, other gaskets could be placed. But it would be... There is no reason to do that. And because this now... Why does the patent disclose the second embodiment? Just curious. Why is there a second illustration where there's a gasket right there at the juncture and there's a second band further up the lateral pipeline at just about the same location as you see in Keys 1118? The reason, Your Honor, is because the water, where the focus is here, is in the water entering at the juncture and into the main pipe, the main sewer pipe. The water is not going to be traveling up. It's going to follow the path of least resistance. Also important to note is that numeral 60, which, as you say, is a carryover, is nowhere described in the written description. And so I think Petitioner and the Board read too much into the fact that there happens to be another band. And there isn't... Well, the inventor went out of his way to create another illustration, another figure, Figure 6. And is there any other distinction in Figure 6 from the other figures aside from that band? Figure 6, I believe, Your Honor, shows the lateral liner as it has been inverted into the lateral pipe. So does Figure 3. As does Figure 3. I think where you're going is the Board, in trying to bolster its increased sealing rationale, considered simply adding this other hydrophilic band, but it would have served no useful purpose. It would have been superfluous. Why? Because the KAIST 118 water containment approach is premised upon that T-liner being watertight. And there was no recognition in the art that the T-liner was not always watertight, and it could leak. Furthermore, Your Honor, unpredictability here really belies any expectation of success about adding a discrete hydrophilic band around the juncture or the elbow, as you say. We're talking about a highly specialized field. Everything is done underground with robots. And where water comes in, where it travels, is very unpredictable, and it's variable. If you've ever had a problem with a leaky basement, you know about unpredictability. What is the inventive step, the non-obviousness? Why is it not obvious to place this sealant material at the very location where the leak is? Why not put the Band-Aid where the wound is? And the reason, Your Honor, is first, we have to start... You have a prior art reference, KAIST 663, that did just that, with different material, but nevertheless did a direct treatment on where the cracks are. But what KAIST 663 used, first of all, a fundamentally different type of lining technique. And what the Board did here, I submit, was a very superficial analysis of those references. Yes, the KAIST 663 talks about hydrophilic, talks about gasket. That's where the similarities stop. Our brief, we talk about the significant difference in hydrophilic chemical grouting. The gasket in 663, it was a piece of... It was a sponge, just like you'd have in your kitchen. Soaks up a liquid hydrophilic material. When it's compressed, it disperses into the cracks, crevices, voids. It is thought to be... Hydrophilic chemical grouting is thought to be tailor-made for that junction. Why? Because it goes and disperses in all the different areas. The reason that it's not a obvious inventive step here is because the starting point is KAIST 118. And KAIST 118 already took care of the damaged pipe juncture with the cured-in-place T liner. And then what you're left with is the water flow that may get into that annulus and go off the ends of the T liner. But 118 addressed that with this water containment approach. But what's important in terms of the fundamental distinctions between the two KAIST references that the board did not appreciate is those hydrophilic bands in KAIST 118 are very different than chemical grouting. It's not a liquid. It's a discrete band. It's not flowable. And in fact, 118 teaches a way... Mr. Hardy, you're well into your rebuttal time. Do you want to save the remainder? I'll follow up on the last point if I could. The 118 actually teaches a way from putting that hydrophilic discrete band around the juncture because it teaches very clearly... Please review... I would submit figures five and six show how those bands are to be placed on opposite sides of the damaged pipe, not in, at, or on. Okay, thank you, Mr. Chambers. I'm Scott Chambers. I'm here with Max Zapatka. We're here representing VLD. I'd like to make three points today. The first is that all of the limitations in the challenge patent are found in the 118 patent except placement of hydrophilic material or a hydrophilic gasket at a known weak junction between the lateral and the main pipe. The second point is the 597 teaches the value of putting a hydrophobic material or a hydrophilic gasket at that known weak junction between the lateral and the main pipe. And the board only used the 597 to point out that this was a known weak position and they were going to put a gasket there. Finally, expert testimony indicates that engineers were well aware of the leakage of the main lateral line repair. And that's covered in our brief, but it's also in the appendix. It's 1966 to 67 from the deposition of Mr. Fletcher. It's also in the declaration of Mr. Fletcher at 18. And all parties indicate that you would put a camera in this to inspect the pipe before you would do the repair and you would inspect the pipe even up to a year later to see if the repair was holding. And the parties indicate that you would be able to tell if there was a leak from a camera. So you would expect that this was known. The only evidence that they provided that this was something unknown, that leakage was unknown, were the self-serving declaration of the inventor, the declaration of their expert, as well as the San Paolo report. This was in front of the board. The board looked at it. The board did not give very much weight to the San Paolo report because there were, I believe, 188 different very leaky junctions. They fixed 150 of them. And it cut down the amount of leakage by no more than 60%. So you really couldn't tell how much leakage was going on. So there's really no evidence in the record that there was leakage. Simply looking at figure six of the patents in suit and figure three in the 118 shows the great similarity. Now, is your theory of the rejection moving one of the bands in 118 from somewhere away from the juncture, through the juncture, or is it keeping those bands exactly where they are and then going ahead and installing a third one at the junction? Your Honor, we think that either one of those, the board said it was irrelevant whether you were moving it or not. And when you look at the 118, the 118 puts those bands on each end of the lateral. In the patents in suit, most of those don't even require a complete band. So you're not really necessarily having to move those. But given the fact that there was a T-liner that without those bands was known to leak, I would think that you would put those bands in and then you would put that additional protection up there. Keep in mind that the whole purpose for this CIPP, the cured in place pipe, basically a pipe within a pipe, is so you don't have to dig it up. You want to make sure that you're not going to have to dig it up because these are going to be six to 15 feet underground and that's going to be expensive. So it's very cost effective to just put a little bit of paste around where the juncture is going to be. And this is something that was well known in the field according to the expert and something that you would naturally expect individuals to do. Okay, can I just ask about there's one passage of I guess it's the Campbell Declaration? Yes. And I'm looking particularly at Appendix 2076 and 2077, paragraph 51 I guess in particular, which seems to make a point. I'm not sure LMK has really stressed this though, mentioned it in passing. And that it would be surprising to think that the paste or the band would stick to the defective surface. That's why you put it on the uninterrupted or undisrupted or whatever his phrase was, surface. So you wouldn't actually expect when you start with, is it the 118? The 118 with the bands on nice clean surfaces that are going to make a good seal that you would think, oh, go put it on the splotchy surface where it's just not going to adhere very well, which would be different if you have grout that's going to infuse and fill it up. Your Honor, if you had a situation where it was pulled in place, you may well be able to make that argument. But when it's inverted, you can put it right there where it's going to flip out. Now, the important point to keep in mind is that one of the reasons they may not have made that argument is because they have a patent on file at the patent and trademark office where they do exactly that. Now, that's cited, I believe, in our footnote 0.8. They've since indicated in that patent that this particular material could be a sponge with liquid grout put into it, just like in the 597. Now, this was not part of the case. We found it. We put it in the brief. There's no indication that they brought the attention to the examiner, that this was something that the board had already made a ruling on. But there's a good reason that this wouldn't be an issue. Now, if it was true that you couldn't pull it into place, then that particular patent must not be enabled. But no matter what, one of skill in the art trying to do a belt and suspenders approach would put some of this material there even if you were going to pull it in place. And the reason is you don't want to have to dig this thing up once you get it done. So you pull it in place and if some of it gets smeared off, at least there will be some. Keep in mind that it's not going... I'm sorry. It's not going to pull all of it off. You've got this thing laying there for the pull in place. You're pulling it along. Well, let me just focus on at least what's in my mind. I read that paragraph 51 to say, and maybe I'm saying it now more strongly than it says, you wouldn't put the sticky part of a Band-Aid on the sore. It won't stick. You put the sticky part on the good skin. So why would you put the sticky part on the splotchy T-junction? The idea was not that it wouldn't stick, but that it would be scraped off during the pull-in. Now, if you think about a tube and you're pulling this thing through, you're going to pull it through and gravity is going to take care of keeping it down. Then when you inflate it or when you pull it up, you're going to have this thing match. It's not going to get scraped off. That was not part of the briefing. Part of that was because during the deposition, we went into that issue, went into the fact that, well, if it was going to be scraped off, why is there a particular patent that has this? I don't think that we would expect it to be getting scraped off, especially since we now have a patent that does exactly that or an application. I'm wondering if the response is also, in part, you're having some of the sealant material covering the crack, maybe the little corroded area, but then you also have sealant area on both sides of that crack to ensure that the water, it's staying adhered to the juncture so that you can make sure  through the sides of that crack. That's absolutely correct, Your Honor, because when you have this paste put on, you pull it into place and then you inflate it, you're basically squeezing the paste up to take care of any non-uniformity so that even if it was only a partial or even if some got scraped off, you would still be doing something of value here. You'd still be getting it to be a better approach so that you wouldn't have to dig it up. Mr. Chambers, Mr. Hardy began his argument with objective evidence suggesting that the board erred in failing to consider the objective evidence that they introduced. Can you respond to that? Your Honor, the objective evidence that they suggest is that there was a long-felt need, but yet they also suggest that nobody knew about this. Well, four years is what the Leo Pharma case said. I'm sorry. There were four years separation between the filing of the 118 and the filing of the patents in suit. Four years is not a long time. We don't know when conception really occurred. In some cases, when you're given an application, it might take a little while to get filed. So the first is that it's four years or less. In Leo Pharma, that was 10 years the board said, I'm sorry, the court said, this could be one consideration. Didn't say that was the whole consideration. And this was rejected, the idea of the distance in time later on in the Nike case when the board said that the court said without a long-felt need that this was not relevant. Now, in terms of that, one, we dispute the fact that nobody knew about this. But we also dispute the fact that four years is that long because we believe people were doing it. We believe that this was something that was obvious and that you would naturally put this material on. What people were doing in the field is not part of a proceeding before the Patent and Trademark Office. But it's certainly true that four years is not considered, it would be new law to assume that four years was the creation of a new standard for a dish of obviousness. Yeah, he didn't mention it today's argument, but what about the award, Chicago Innovation Award? I'm sure I'm getting the name wrong, but there was an award that they alleged the commercial embodiment of this patent won. Well, first of all, Your Honor, it's misleading. It's not an industry-heroic award. And most importantly, it's not commensurate in scope with the claims. For evidence of commercial success, you're going to want to have something commensurate with the claims. Well, that award was for something... You probably ought to tie yourself to the podium. Sorry. That was something that was something that had a flange in addition to the gasket. The board specifically did not institute this IPR proceeding. On those claims that required a flange along with the gasket. So that those claims... Was there any fact-finding or acknowledgement by the board or recognition that this doesn't constitute evidence of objective and dish of non-obviousness because it's not commensurate in scope? Your Honor... They just didn't address it as the problem. We pointed out that it wasn't commensurate in scope, but... Was it even raised to the board? I would not say... It was not raised except in the... The briefing by the parties that an industry award had been given. And then once it was pointed out that it wasn't an industry award, it was something that was... Done by a group of people just talking about this particular product in the location that it was at. In other words, it wasn't a bunch of people saying, well, we really have a lot of interesting things and one of the great new things that we have is this particular item. There was no evidence of how much money was being spent. There was no evidence that would really be required to show that this was some sort of commercial success. Without that evidence, why does the board have to proceed? Well, we've repeatedly held that the board can't ignore objective indicia in its analysis and here they didn't speak to it. So is it at least or possibly a failure to articulate findings of fact and conclusions of law on their part? Your Honor, I would say that it's a failure on the side of the patent owner to bring that fully to the fore so that the board can see it. That it should not be the job of the board to guess when somebody is saying commercial success, especially when it's not commensurate in scope with the claims and where it's not really an industry award. I don't believe it would be good policy to have the board have to guess and read between the lines. If an applicant wants to give a reason, they should articulate it. I don't believe that this was well articulated in terms of the scope of this award. I understand. Is there anything in the last few seconds? Are you good? Your Honor, we'll rest on this testimony as well as the briefs. Very good. Okay, thank you, Mr. Chambers. Mr. Hardy. Thank you, Your Honors. With respect to the Campbell testimony that one of the ordinary skilled in the art would not expect, have an expectation of success is exactly the distinction between the Keist 118 and the 563. The chemical grouting, that's why it has been used at the pipe juncture because of its properties that it disperses. The fact that you have these discrete hydrophilic bands, the 118 specifically teaches that you do not put those at the damaged area. Figures five and six of the 118 show and teach that you put those on the outside where they can actually create a seal against the hopes pipe and connect it. So there would be no motivation to now take those discrete hydrophilic bands and move them to the pipe joint where the damage actually is occurring. Well, I think in one of the board decisions, the board said, among other things, there are no guarantees in life, especially when it comes to repairing sewer pipes. So why not go ahead and give a little help to the juncture where there's a problem, where the cracks are? Well, your honor, there are no guarantees in life, but if there was a belt and suspenders approach here, it would have been to go ahead, take the bands of the 118 and put in a chemical grout ring if that's what you wanted to do because that is where hydrophilic grouting was known to be successful. There was no suggestion to take a material that has a fundamentally different property, different applications, a swell seal type material and move it to the juncture. And I would like to bring to the court's attention that the superficial analysis and failure to appreciate the differences between the chemical grouting of 597 and the KAIST 118 was made crystal clear when the board stated the following. Appendix 30, the board stated that, excuse me, appendix 27, the relevant difference between the two techniques in KAIST 597 and KAIST 118 is the location of the gaskets. That failed to account for the many differences that have been discussed, that were unrefuted in the record between hydrophilic chemical grouting on the one hand and use of those swell seal gaskets that were only known to contain water on opposite sides of the damage pipe. Okay, thank you, Mr. Hardy. I thank both counsel. The case is taken under submission.